1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE CHRISTOPHER SMITH, | Case No. 1:21-cv-01346-JLT-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| KEN CLARK, | |
| Respondent. | |

Petitioner Lawrence Christopher is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

**I.**

**BACKGROUND**

Petitioner was charged with several crimes arising out of four incidents that occurred while he was an inmate at Corcoran State Prison. People v. Smith, No. F076167, 2020 WL 2520062, at *1 (Cal. Ct. App. May 18, 2020). On July 5, 2017, Petitioner was convicted by a jury in the Kern County Superior Court of three counts of obstructing/resisting an executive officer (counts 1, 3, 6); aggravated battery on a state prison officer (count 2); two counts of being a prisoner in possession of a weapon (counts 4, 7); and manufacturing a sharp instrument while in prison (count 5). (7 CT[1] 1838–51.) On August 2, 2017, Petitioner was sentenced to six

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on November 3, 2021. (ECF No. 12.)

1 consecutive imprisonment terms of twenty-five years to life on counts 1, 2, 3, 4, 6, and 7. The

2 court stayed execution of the twenty-five years to life term as to count 5. (7 CT 1911–13.)

3       On May 18, 2020, the California Court of Appeal, Fifth Appellate District, conditionally

4 reversed the judgment and directed the trial court to disclose to Petitioner certain information

5 pertaining to two internal affairs investigations and to give Petitioner "a reasonable opportunity

6 to investigate the disclosed material and determine whether it would have led to any relevant and

7 admissible evidence he could have presented at trial." Smith, 2020 WL 2520062, at *18. "If

8 [Petitioner] can demonstrate a reasonable probability of a different outcome had the evidence

9 been disclosed, the trial court must order a new trial. If [Petitioner] cannot, the judgment is to be

10 reinstated." Id. In all other respects, the judgment was affirmed. Id. On August 12, 2020, the

11 California Supreme Court denied Petitioner's petition for review. (LDs[2] 5, 6.) On April 30, 2021,

12 Petitioner elected not to pursue a motion for new trial and requested that the judgment be

13 reinstated. (LD 7.) Subsequently, Petitioner filed multiple state habeas petitions, which were all

14 denied. (LDs 8–15.)

15       In the instant federal petition for writ of habeas corpus, Petitioner raises the following

16 claims for relief: (1) unreasonable search and seizure; (2) false evidence; (3) judicial bias; and

17 (4) selective prosecution. (ECF No. 1.) Respondent filed an answer, and Petitioner filed a

18 traverse and supplemental traverse. (ECF Nos. 11, 21, 22.)

19 **II.**

20 **STATEMENT OF FACTS[3]**

21 ***Charged Conduct***

22 ***February 4, 2015 (Count 1)***

23 On February 4, 2015, appellant, a secure housing unit (SHU) inmate[4] was being
escorted by Correctional Officer Andres Cantu. While he was being escorted,

24 appellant became agitated and cursed at Cantu, saying, "Fuck you, motherfucker.
Take these cuffs off, let's see how tough you are, motherfucker." Eventually,

25 appellant lunged backwards toward Cantu. Cantu pushed appellant away, struck
him with a baton, and took him to the ground. Appellant began to kick and move

26

27 [2] "LD" refers to the documents lodged by Respondent on November 3, 2021. (ECF No. 12.)
[3] The Court relies on the California Court of Appeal's May 18, 2020 opinion for this summary of the facts of the
crime and the procedural history of the case. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

28 [4] The most violent inmates are housed in SHUs.

his upper body. Cantu's partner had to get on top of appellant to try to control appellant. Appellant continued to try to kick back towards the officers, move his lower body, and stand up. Cantu had to pepper spray appellant to get him to comply.

**February 25, 2015 (Counts 2 and 3)**

Due to the events of February 5, 2015, a rules violation report (RVR) hearing was held on February 25, 2015. The hearing was conducted by Correctional Lieutenant Brian Parriott. Appellant requested Cantu as a witness. While Cantu was answering his first question at the hearing, appellant spat through his cell towards Cantu.[5] Saliva hit Cantu's face and dripped down his uniform. Appellant said either "you are a lying bitch" or "you are a fucking lying bitch." A "Code 1" alarm was dispatched, and Officers James Mattingly and Gutierrez responded. Mattingly put a "spit mask," a mesh hood put over inmates who are attempting to spit, on appellant and placed him in handcuffs.

Mattingly and Gutierrez then escorted appellant back to his cell. At one point, appellant tensed up and became hesitant to walk. When they got into the rotunda, an enclosed common hallway with a door to each section of the housing unit, appellant pulled away from Mattingly and aggressively lunged toward Gutierrez. Mattingly forced appellant to the ground and then escorted appellant back to his cell.

**April 16, 2015 (Counts 4 and 5)**

On April 16, 2015, Correctional Officer Ryan Jensen conducted a search on appellant's cell, of which appellant was the only occupant. In a hole in appellant's mattress, Jensen found an inmate-manufactured weapon. The weapon was aqua blue in color, 3.5 inches long, .5-inch wide, .25-inch thick and sharpened on one end. The other end was wrapped in linen to form a handle. The weapon looked as if it was made out of hard-plastic cups issued to inmates. The linen was likely made from a bed sheet and the material inmates are issued to use as dental floss. Jensen also recovered other items that looked like they were about to be turned into weapons.

**September 2, 2015 (Counts 6 and 7)**

On September 2, 2015, Correctional Officer Gary Wildey went to appellant's cell to escort him to the dining hall to conduct an unclothed body search before releasing him to the exercise yard. Wildey had been told appellant had a history of staff assaults, particularly that appellant posed a risk of gassing by spitting. Wildey, his partner, and appellant entered the rotunda. Appellant pulled away from Wildey, made a "clearing his throat" sound, and pursed his lips as if he was about to spit. Wildey pushed appellant into the rotunda wall and ordered him to get down; appellant did not comply. Wildey struck appellant with his baton, and appellant still did not get down. Appellant was attempting to turn and kick his feet. Wildey struck appellant with his baton again, and appellant fell. Wildey lost his balance and fell on top of appellant. Appellant continued to kick. Officer Pearce sprayed appellant with pepper spray in the face and eyes, and appellant continued to resist. Pearce sprayed appellant again in two to three second bursts until appellant complied. A code 1 alarm was sounded, and medical staff

---

[5] An inmate spitting on, or throwing bodily fluid such as urine, feces, or blood, at an officer is known as "gassing" and is a serious rules violation.

responded. The medical staff cleared appellant to be taken from the rotunda, and all who were present went outside into open air.

Correctional Sergeant Mello responded to the alarm and relieved Wildey. Mello conducted an unclothed body search on appellant and found an "inmate manufactured stabbing weapon" in appellant's boxers. The weapon was four and a half inches long and sharpened to a point like a double-edged dagger. The weapon appeared to be made out of a state issued cup. It had a piece of bedsheet wrapped around it to use as a handle. The cloth was secured with "dental loop" given to inmates to floss with.

### *Uncharged Conduct Admitted Pursuant to Evidence Code section 1101, subdivision (b)*

At trial the prosecution offered evidence regarding the following uncharged prior bad acts to show identity with regard to the weapons offenses; intent with regard to the resisting and battery offenses; and common plan or scheme with regard to all of the offenses.

### *April 24, 2010*

Correctional Sergeant Todd Ibbs worked in the Substance Abuse Treatment Facility adjacent to Corcoran State Prison. On April 24, 2010, Ibbs heard a loud banging and heard appellant yelling: "Fuck this nigga" and "Get this piece of shit out of here" and laughing. Ibbs saw appellant standing in his cell over his cellmate who was lying on the floor. Appellant's cellmate was bleeding from his head and facial area. Ibbs ordered appellant to put his hands through the cell door food port and submit to handcuffs. Ibbs cuffed appellant and ordered appellant to step to the back of the cell, which appellant did. Ibbs could not open the cell door all the way and had to attempt to open it several times before it finally opened. Ibbs observed that two racquet balls had been wedged in the door between the door and the wall. Correctional Officer Jason Sanchez was assigned to process the crime scene. In the course of his search, Sanchez discovered an inmate manufactured weapon in the bowl portion of the urinal. Inmates often flush contraband down the toilet. The weapon was sharpened to a point and the handle was made out of a cloth material affixed with dental floss-type bonds. Appellant's cellmate was unconscious and would not have been able to flush the weapon down the toilet.

### *October 4, 2011*

On October 4, 2011, Correctional Officer Justin Anderson conducted a search of appellant's cell when appellant was an inmate at Kern Valley State Prison. Appellant was the only occupant of his cell but was not present during the search. Anderson found a plastic food tray with two pieces missing. Anderson found the missing pieces behind pictures taped to the wall. The pieces could be used to be sharpened to a point and the dimensions were similar to those of inmate manufactured weapons.

### *March 13, 2013*

On March 13, 2013, Correctional Officer Kevin Hunt was working at Kern Valley State Prison. He heard a sergeant yell "Get down," and ran toward the scene. Appellant was being restrained and as Hunt attempted to help other officers restrain appellant, appellant spat on Hunt's boot.

4

*May 5, 2016*

On May 5, 2016, Correctional Sergeant Mike Worrell was a transportation sergeant tasked with picking appellant up from Corcoran State Prison traveling to the courthouse and back again. While Worrell was removing appellant's restraints, appellant threw an envelope full of appellant's legal paperwork at Worrell, and it hit Worrell in the chest.

*August 3, 2016*

On August 3, 2016, Correctional Sergeant Timothy Reynolds was transporting appellant to Wasco State Prison. Appellant was taken off the bus and was escorted from the bus. Reynolds removed appellant's right hand from his hand cuffs, at which point appellant punched Reynolds in the mouth.

After the incident with Reynolds, Correctional Sergeant Philip Arias escorted appellant to a holding cell. Arias was about to take off appellant's restraints, when appellant made a "hacking" sound like he was going to spit.

*August 15, 2016*

On August 15, 2016, Correctional Officer Jose Andrade was transporting appellant from the Kern County courthouse back to state prison custody with Correctional Sergeant Michael Allen Peters. Andrade and Peters took appellant to change from county clothing to state clothing in a "dress-out" room in Lerdo. As Andrade was undoing appellant's left handcuff, appellant, without warning, violently lunged toward Andrade. Appellant wiggled out of the cuff and struck Andrade with his closed fist. Appellant tried to hit Andrade's face, but Andrade blocked the hit with his forearm.

While waiting for medical evaluations after this incident, appellant told Peters, "thank you for not hurting my fingers." Peters told appellant they were not trying to hurt him. Appellant responded by saying, "Well, I'm trying to hurt you." Peters said, "Really?" and appellant responded, "Anytime cuffs come off, I am coming after you all.... Yep. Cuffs come off, it's on.... I busted that transportation sergeant in the mouth, and that punk bitch didn't do anything."

*August 22, 2016*

On August 22, 2016, Correctional Officer Rolando Gonzales was working at Wasco State Prison as a medical escort officer. Gonzales was escorting appellant to medical for a blood draw. While Gonzales was attempting to place leg restraints on appellant, appellant spit at Gonzales, and saliva landed on Gonzales's face.

*September 15, 2016*

On September 15, 2016, Correctional Sergeant Jesse Navarro and Correctional Officer Aguirre were tasked with removing appellant from an individual exercise module at Corcoran State Prison. They began the process of placing appellant in restraints when appellant threw a liquid substance at the officers. The substance hit both Navarro and Aguirre. It was a brown liquid substance that had a strong pungent smell of urine and feces. Appellant had a small milk carton in his hand.

***December 5, 2016***

On December 5, 2016, Correctional Officer John Elizalde was picking up appellant from Corcoran State Prison to take him to court. When they got back to the prison, Elizalde and his partner went to the rear of the vehicle to unload appellant. Elizalde faced appellant against a wall while his partner was checking the vehicle. Elizalde turned to look toward the vehicle and when he turned back to appellant, appellant quickly turned and punched Elizalde in the face. Appellant had somehow "defeated that cuff." Elizalde was knocked to the ground. Appellant ran towards the vehicle where Elizalde's partner was until appellant was stopped by responding Corcoran staff. Elizalde got a broken nose and needed stitches to his nose and forehead.

***Appellant's Defense***

Appellant's closing argument comprised of questioning the credibility of the complaining witnesses. He suggested the complaining witnesses were acting in "retaliation" against appellant for filing complaints and that appellant was in many cases of the alleged assaults "defending himself."

Smith, 2020 WL 2520062, at *2–4 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

///

6

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

1   court's ruling on the claim being presented in federal court was so lacking in justification that

2   there was an error well understood and comprehended in existing law beyond any possibility for

3   fairminded disagreement." Id. at 103.

4          If the Court determines that the state court decision was "contrary to, or involved an

5   unreasonable application of, clearly established Federal law," and the error is not structural,

6   habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

7   injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

8   (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

9   (1946)).

10          AEDPA requires considerable deference to the state courts. Generally, federal courts

11   "look through" unexplained decisions and review "the last related state-court decision that does

12   provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

13   adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption

14   may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on

15   different grounds than the lower state court's decision, such as alternative grounds for affirmance

16   that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

17          "When a federal claim has been presented to a state court[,] the state court has denied

18   relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

19   the state court adjudicated the claim on the merits in the absence of any indication or state-law

20   procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a

21   decision on the merits and there is no reasoned lower-court opinion, a federal court

22   independently reviews the record to determine whether habeas corpus relief is available under

23   § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

24   record is not de novo review of the constitutional issue, but rather, the only method by which we

25   can determine whether a silent state court decision is objectively unreasonable." Himes v.

26   Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

27   record and "must determine what arguments or theories . . . could have supported, the state

28   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

8

1  those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

2  Court." Richter, 562 U.S. at 102.

### IV.

### DISCUSSION

**A.  Unreasonable Search and Seizure**

In his first claim for relief, Petitioner asserts that the trial court erred in denying his motion to suppress evidence of the weapon found on Petitioner's person by Sergeant Mello because the search and seizure was unreasonable. (ECF No. 1 at 5–7.)[6] Respondent argues that Petitioner's Fourth Amendment claim is not cognizable. (ECF No. 11 at 14.) This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale," Wilson, 138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal.

In denying Petitioner's unreasonable search and seizure claim, the California Court of Appeal stated:

**A. Relevant Background**

On April 1, 2016, appellant filed a motion pursuant to section 1538.5 to suppress the weapon that was seized as a result of his unclothed body search on September 2, 2015.

A hearing was held on the motion on May 5, 2016, before Judge Humphrey. Appellant asserted the search was unreasonable and that the evidence was "planted."

Mello testified that on September 2, 2015, he responded to an alarm in the SHU. Mello responded to the rotunda of the housing unit, which is a confined four-foot-wide hallway. When Mello arrived, he saw appellant and about six or seven officers. Pepper spray had been deployed in the rotunda. Mello found it difficult to inhale. Appellant was exhibiting symptoms of being affected by the spray, including nasal discharge and closed eyes. The other officers in the rotunda informed Mello that appellant tried to spit on one of the escorting officers.

Mello ordered appellant to be moved from the rotunda area because it was a confined area. Mello needed to relieve the officer escorting appellant, but it was

_____

[6] Page numbers refer to the ECF page numbers stamped at the top of the page.

unsafe to do so at the time. Mello decided to move appellant because of the noxious effects of the pepper spray.

Usually to decontaminate someone who has been sprayed with pepper spray, officers remove the inmate from the affected area, offer them water decontamination, and then place them into "moving air." This causes the pepper spray to degrade. Mello offered appellant water decontamination, which appellant refused.

Appellant was moved to the yard in front of the housing unit. The area is in between the individual exercise modules and the rotunda but is closer to the rotunda. Mello cut appellant's clothes off with a pair of "cut-down scissors." Appellant was wearing a T-shirt and boxers; Mello testified there was nothing unusual about an inmate going to the individual exercise modules in boxers and a T-shirt. When Mello cut off appellant's clothing, he found a weapon. Mello described the weapon as a "puncturing weapon," being four and a half inches long, made from a state-issued cup. The weapon was secured to appellant's boxer shorts with a "dental loop."

There were no inmates in the area where appellant was taken for the unclothed search. There were six to eight male correctional officers present, who were there to respond to the alarm. None of the officers appeared to take any inappropriate interest in appellant, and no catcalling or rude comments were directed toward appellant when he was undressed. There was no commotion at all during the time of the search. Appellant was walked back into the housing unit naked and was placed in a "management cell," where he was given new clothes. Appellant was not "paraded in front of female officers" as he was walked back inside.

There were no other locations of the prison that would have a view of the search. The reason appellant was not moved into a holding cell in the dining hall to conduct the search was because he had to be removed from the contaminated area.

Mello testified that prisoners in general are searched frequently. When SHU inmates are released to use individual exercise modules, they are always strip searched.

Appellant argued the search was "illegal and improper ... and retaliation from protected speech and conduct within the state and federal courts against correctional officers for prior allegations of sexual misconduct and harassment, and basically this was a retaliatory act against my person with basically false evidence presented against my person."

The court found Mello conducted the search in a reasonable manner and denied appellant's motion to suppress.

**B. Analysis**

Appellant contends the trial court erred by denying his motion to suppress. We disagree.

When reviewing a court's ruling on a motion to suppress, we review the facts as determined by the trial court under the substantial evidence standard and apply the de novo standard of review in determining whether the facts constituted an unreasonable search. (*People v. Mateljan* (2005) 129 Cal.App.4th 367, 373.)

There is no requirement that a search of a prisoner be supported by either probable cause or reasonable suspicion. (*People v. Collins* (2004) 115 Cal.App.4th 137, 154–155.) The relevant inquiry is whether the search was reasonable under the circumstances. (*Ibid.*) The determination of reasonableness depends on the specific facts presented. (*Ibid.*) In particular, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (*Bell v. Wolfish* (1979) 441 U.S. 520, 559.)

Appellant acknowledges the legal question before the trial court was whether the search was reasonable under the circumstances. Appellant contends the search was unreasonable because it was conducted outdoors and in view of several staff members.

The United States Supreme Court has explained:

> "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citation.]" (*Bell v. Wolfish*, *supra*, 441 U.S. at pp. 547–548.)

Appellant acknowledges this caution in *Bell v. Wolfish*. He urges us, however, to find that Mello "exaggerated his response to the need to conduct an unclothed body search of appellant's person." On this record, we cannot do so.

The reason the unclothed body search was conducted outside was because pepper spray had been deployed in the enclosed area of the rotunda. The only people present during the search were prison employees who did not harass or make comments toward appellant while the search was taking place. The area was not in view of any other employees or inmates. Appellant was taken back inside after the search and into a cell, which was also done outside the view of anyone else. Appellant was given new clothes upon being brought to his other cell. The search was conducted immediately after appellant had used force against a correctional officer and had to be pepper sprayed in order to be subdued. In the interest of prison security, we cannot say Mello was unreasonable for conducting the search in a timely manner.

Appellant points out that California Code of Regulations, title 15, section 3287, subdivision (b) requires that unclothed body searches

> "shall be conducted in a professional manner which avoids embarrassment or indignity to the inmate. Whenever possible, unclothed body inspections of inmates shall be conducted outside the view of others."

Appellant contends it was "possible" under the circumstances for the search to have been conducted in another area indoors outside the view of the other officers after appellant had been decontaminated from the pepper spray. According to appellant, the search therefore was conducted in violation of California Code of

Regulations, title 15, section 3287, subdivision (b) and thus "unreasonable" for the purposes of his motion to suppress.

To support this contention, appellant points to the events of February 4, 2015, testified to at trial. We reject this claim. On February 4, 2015, after pepper spray was deployed to subdue appellant, appellant was escorted to a holding cell in one of the dining halls. Appellant was then removed from the holding cell, taken outside to be decontaminated with water, and brought back to the holding cell where appellant submitted to an unclothed body search. On this record, we cannot say the events of February 4, are similar enough to those of September 2 for us to be able to say it was "possible" for appellant to be searched outside the view of others within the meaning of California Code of Regulations, title 15, section 3287, subdivision (b), and thus that the search was unreasonable. On February 4, the pepper spray was deployed outdoors ; there was not a pressing reason to take appellant outside as there was on September 2.

Further, the reason appellant was taken to the holding cell on February 4, and not searched immediately was because it appeared to the lieutenant that appellant was "tense" and "irate" and displaying "extreme[ ] frustrat[ion]" and the lieutenant felt it necessary for appellant to be put in the holding cell to calm down before being decontaminated from the pepper spray; there was no such reason on the record for appellant to be calmed down before his September 2, 2015, decontamination or search. Further, Mello expressly testified it was not possible for appellant to be taken to a holding cell in the dining hall on September 2, 2015.

The court did not err by denying appellant's motion to suppress.

Smith, 2020 WL 2520062, at *4–7.

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone, 428 U.S. at 494. See Newman v. Wengler, 790 F.3d 876, 881 (9th Cir. 2015) (holding Stone survived enactment of AEDPA). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did, in fact, do so, or even whether the claim was correctly decided." Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996) (citations omitted).

Here, Petitioner raised the unreasonable search and seizure issue in a pretrial motion, the trial court held a hearing, and the California Court of Appeal reviewed the trial court's decision. The Court finds that the state courts provided Petitioner with a "full and fair opportunity to litigate" his Fourth Amendment claim. Stone, 428 U.S. at 494. See, e.g., Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005) (holding that petitioner had a full and fair opportunity to

1   litigate his Fourth Amendment claim when "[h]e raised the warrant issue in a pre-trial motion;

2   the trial court held a hearing on the issue at which [petitioner] was allowed to present evidence

3   and examine witnesses; the trial court made a factual finding, and appropriately limited the

4   admissible evidence to that described in the warrant affidavit; and the Arizona Supreme Court

5   reviewed the trial court's decision"); Abell v. Raines, 640 F.2d 1085, 1088 (9th Cir. 1981)

6   (holding that petitioner had a full and fair opportunity to litigate his Fourth Amendment claim

7   when evidentiary hearing on motion to suppress was held, the "issues were thoroughly briefed at

8   the trial level and rejected," the issue was raised on appeal and "carefully considered and

9   squarely rejected," and petitioner's post-conviction remedies were exhausted). Accordingly,

10  Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

11          **B.  False Evidence**

12          In his second claim, Petitioner asserts that the trial court erred in not dismissing the false

13  charges against him. Petitioner contends that correctional officers falsified evidence in retaliation

14  for initiating civil rights lawsuits against them. (ECF No. 1 at 9–10.) Respondent argues that

15  Petitioner is not entitled to relief on this claim because a fairminded jurist could conclude that the

16  record proved no trial evidence was "actually false," Petitioner's declarations regarding

17  fabrication and retaliation were void of specifics and conclusory such that relief was not

18  warranted, or that any conflict in testimony was for the jury to resolve. (ECF No. 11 at 16–17.)

19          This claim was raised in a state habeas petition in the California Supreme Court, which

20  summarily denied the petition. (LDs 14, 15.) The Court presumes that the state court adjudicated

21  the claim on the merits. See Richter, 562 U.S. at 99 ("When a federal claim has been presented to

22  a state court and the state court has denied relief it may be presumed that the state court

23  adjudicated the claim on the merits in the absence of any indication or state-law procedural

24  principles to the contrary."). Accordingly, AEDPA's deferential standard of review applies, and

25  as there is no reasoned state court decision on this claim, the Court "must determine what

26  arguments or theories . . . could have supported, the state court's decision; and then it must ask

27  whether it is possible fairminded jurists could disagree that those arguments or theories are

28  inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

1       "AEDPA . . . restricts the scope of the evidence that we can rely on in the normal course

2  of discharging our responsibilities under § 2254(d)(1)." Murray v. Schriro, 745 F.3d 984, 998

3  (9th Cir. 2014). "AEDPA's 'backward-looking language requires an examination of the state-

4  court decision at the time it was made. It [then logically] follows that the record under review is

5  limited to the record in existence at that same time, *i.e.*, the record before the state court.'" Id.

6  (alteration in original) (quoting Cullen v. Pinholster, 563 U.S. 170, 182 (2011)). Accordingly,

7  this Court will limit review to the record before the state court.

8       "The knowing use of false evidence by the state, or the failure to correct false evidence,

9  may violate due process." Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010) (citing Napue v.

10  Illinois, 360 U.S. 264, 269 (1959)). "Under this clearly established Supreme Court precedent, the

11  petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution

12  knew or should have known that the testimony was actually false, and (3) that the false testimony

13  was material." Soto v. Ryan, 760 F.3d 947, 958 (9th Cir. 2014). In assessing materiality, the

14  Court must determine whether "there is 'any reasonable likelihood that the false testimony could

15  have affected the judgment of the jury.' " Id. (quoting Hayes v. Brown, 399 F.3d 972, 978 (9th

16  Cir. 2005)).[7] A court need not review all three Napue prongs if a petitioner's argument fails at

17  any one of the prongs. See Panah v. Chappell, 935 F.3d 657, 664 (9th Cir. 2019); Towery, 641

18  F.3d at 308. The Ninth Circuit has "also concluded that a [petitioner]'s due process rights were

19  violated, and accordingly granted habeas relief, when it was revealed that false evidence brought

20  about a [petitioner]'s conviction" even in cases where the prosecutor neither knew nor should

21  have known that the evidence was actually false. Maxwell v. Roe, 628 F.3d 486, 499 (9th Cir.

22  2010) (citing Killian v. Poole, 282 F.3d 1204 (9th Cir. 2002); Hall v. Director of Corrections,

23  343 F .3d 976, 978 (9th Cir. 2003)).

24       On direct appeal, Petitioner argued that the trial court erred in denying his discovery

25  motions as to most of the officer records relating to filing false reports, abuses of power, and

---

26

27  [7] "There is nothing in Napue, its predecessors, or its progeny, to suggest that the Constitution protects defendants only against the knowing use of perjured testimony. Due process protects defendants against the knowing use of any false evidence by the State, whether it be by document, testimony, or any other form of admissible evidence."

28  Hayes, 399 F.3d at 981.

1    excessive force. The California Court of Appeal found Petitioner's claim to be "meritless"

2    because his allegations were "conclusory . . . generic and repetitive," noting that Petitioner did

3    "not describe with any specificity what complaints he made, what they had to do with the

4    officers who authored the reports, or how the officers knew about them." Smith, 2020 WL

5    2520062, at *10, 11. In his habeas petition filed in the California Supreme Court, Petitioner did

6    not address the deficiencies set forth by the appellate court on direct appeal, and other than his

7    uncorroborated statements and declarations, Petitioner did not provide the California Supreme

8    Court with competent evidence to support his allegation that correctional officers falsified

9    evidence in retaliation for Petitioner initiating civil rights lawsuits against them. A fairminded

10   jurist could reasonably conclude that Petitioner's uncorroborated statements and declarations

11   were not sufficient to establish that any evidence used at trial was actually false. See Turner v.

12   Calderon, 281 F.3d 851, 881 (9th Cir. 2002) ("[S]elf-serving statements by a defendant that his

13   conviction was constitutionally infirm are insufficient to overcome the presumption of regularity

14   accorded state convictions." (internal quotation marks and citation omitted)).

15          Based on the foregoing, the Court finds that the state court's denial of the false evidence

16   claim was not contrary to, or an unreasonable application of, clearly established federal law, nor

17   was it based on an unreasonable determination of fact. The decision was not "so lacking in

18   justification that there was an error well understood and comprehended in existing law beyond

19   any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is

20   not entitled to habeas relief on his second claim, and it should be denied.

21          **C.  Judicial Bias**

22          In his third claim for relief, Petitioner asserts that he was denied the right to a fair trial

23   due to the judicial bias of multiple superior court judges. (ECF No. 1 at 11.) The basis for this

24   claim are: (1) the denial of the motion to suppress an inmate manufactured weapon (shank)

25   purportedly recovered from Petitioner's possession; (2) entering a blanket plea of not guilty by

26   reason of insanity to all seven counts rather than only Count 2; (3) allowing correctional staff to

27   remove Petitioner from the custody of Kern County Sheriff's Department, which resulted in

28   Petitioner being the victim of an assault and battery at the Lerdo Detention Facility; (4)

1   threatening Petitioner with physical harm; (5) the denial of a motion for contempt; (6)

2   withholding several records of complaints against Correctional Sergeant Reynolds; (7) inordinate

3   delays in trial court proceedings upon remand; (8) the assignment of a biased investigator; and

4   (9) allowing the prosecution to be present during the discussions and release of the classified

5   complaints against Reynolds. (ECF No. 1 at 11–14.) Respondent argues that the state court could

6   reasonably have denied relief on this claim. (ECF No. 11 at 17–18.)

7          This claim was raised in a state habeas petition in the California Supreme Court, which

8   summarily denied the petition. (LDs 14, 15.) The Court presumes that the state court adjudicated

9   the claim on the merits. See Richter, 562 U.S. at 99 ("When a federal claim has been presented to

10  a state court and the state court has denied relief it may be presumed that the state court

11  adjudicated the claim on the merits in the absence of any indication or state-law procedural

12  principles to the contrary."). Accordingly, AEDPA's deferential standard of review applies, and

13  as there is no reasoned state court decision on this claim, the Court "must determine what

14  arguments or theories . . . could have supported, the state court's decision; and then it must ask

15  whether it is possible fairminded jurists could disagree that those arguments or theories are

16  inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. "AEDPA's

17  'backward-looking language requires an examination of the state-court decision at the time it

18  was made. It [then logically] follows that the record under review is limited to the record in

19  existence at that same time, *i.e.*, the record before the state court.'" Murray, 745 F.3d at 998

20  (alteration in original) (quoting Cullen, 563 U.S. at 182).

21         The Supreme Court has long recognized that due process "clearly requires a 'fair trial in a

22  fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome

23  of his particular case." Bracy v. Gramley, 520 U.S. 899, 904–05 (1997) (quoting Withrow v.

24  Larkin, 421 U.S. 35, 46 (1975)). "The Constitution requires recusal where 'the probability of

25  actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"

26  Hurles v. Ryan, 752 F.3d 768, 788 (9th Cir. 2014) (quoting Withrow, 421 U.S. at 47). Thus, to

27  establish a due process violation Petitioner need not prove actual bias, just an intolerable risk of

28  bias. Hurles, 752 F.3d at 789. However, Petitioner must "overcome a presumption of honesty

1    and integrity in those serving as adjudicators." Withrow, 421 U.S. at 47. The Supreme Court has

2    held that in the absence of some extrajudicial source of bias or partiality, "judicial rulings alone

3    almost never constitute a valid basis for a bias or partiality motion" and "judicial remarks during

4    the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or

5    their cases ordinarily do not support a bias or partiality challenge . . . [unless] they display a

6    deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v.

7    United States, 510 U.S. 540, 555 (1994). See Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir.

8    2008) (applying Liteky in § 2254 habeas proceeding governed by the AEDPA); United States v.

9    Sypolt, 346 F.3d 838, 840 (8th Cir. 2003) (If a petitioner's "claim fails to pass muster under

10   § 455 [federal recusal statute] . . . it cannot survive the more rigorous standards required of a

11   claim under the due process clause.").

12          The majority of the grounds Petitioner states as the basis for his judicial bias claim are

13   judicial rulings, and thus, do not constitute a valid basis for a claim of judicial bias. With respect

14   to threatening Petitioner with physical harm and allowing correctional staff to remove Petitioner

15   from the custody of Kern County Sheriff's Department, which resulted in Petitioner being the

16   victim of an assault and battery at the Lerdo Detention Facility, Petitioner did not provide the

17   California Supreme Court with competent evidence other than his uncorroborated statements and

18   declarations. A fairminded jurist could reasonably conclude that Petitioner's uncorroborated

19   statements and declarations were not sufficient to "overcome a presumption of honesty and

20   integrity in those serving as adjudicators." Withrow, 421 U.S. at 47. See Turner, 281 F.3d at 881

21   ("[S]elf-serving statements by a defendant that his conviction was constitutionally infirm are

22   insufficient to overcome the presumption of regularity accorded state convictions." (internal

23   quotation marks and citation omitted)).

24          **D.  Selective Prosecution**

25          In his fourth claim for relief, Petitioner asserts that the trial court erred in not dismissing

26   the charges because Petitioner was prosecuted in retaliation for initiating civil rights lawsuits

27   against law enforcement personnel. (ECF No. 1 at 16–19.) Respondents argues that Petitioner is

28   not entitled to relief because a "fairminded jurist could conclude that this attempt to extend

1  Petitioner's false-evidence/retaliation allegations to a prosecutor-based legal theory for relief also

2  failed for lack of proof." (ECF No. 11 at 22.)

3       This claim was raised in a state habeas petition in the California Supreme Court, which

4  summarily denied the petition. (LDs 14, 15.) The Court presumes that the state court adjudicated

5  the claim on the merits. See Richter, 562 U.S. at 99 ("When a federal claim has been presented to

6  a state court and the state court has denied relief it may be presumed that the state court

7  adjudicated the claim on the merits in the absence of any indication or state-law procedural

8  principles to the contrary."). Accordingly, AEDPA's deferential standard of review applies, and

9  as there is no reasoned state court decision on this claim, the Court "must determine what

10 arguments or theories . . . could have supported, the state court's decision; and then it must ask

11 whether it is possible fairminded jurists could disagree that those arguments or theories are

12 inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. "AEDPA's

13 'backward-looking language requires an examination of the state-court decision at the time it

14 was made. It [then logically] follows that the record under review is limited to the record in

15 existence at that same time, i.e., the record before the state court.'" Murray, 745 F.3d at 998

16 (alteration in original) (quoting Cullen, 563 U.S. at 182).

17       "[T]he Government retains 'broad discretion' as to whom to prosecute," Wayte v. United

18 States, 470 U.S. 598, 607 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11

19 (1982)), and "so long as the prosecutor has probable cause to believe that the accused committed

20 an offense defined by statute, the decision whether or not to prosecute, and what charge to file or

21 bring before a grand jury, generally rests entirely in his discretion," Bordenkircher v. Hayes, 434

22 U.S. 357, 364 (1978) (footnote omitted). "This broad discretion rests largely on the recognition

23 that the decision to prosecute is particularly ill-suited to judicial review." Wayte, 470 U.S. at

24 607.

25           [A]lthough prosecutorial discretion is broad, it is not "'unfettered.'
            Selectivity in the enforcement of criminal laws is . . . subject to
26          constitutional constraints." United States v. Batchelder, 442 U.S.
            114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979) (footnote
27          omitted). In particular, the decision to prosecute may not be
            "'deliberately based upon an unjustifiable standard such as race,
28          religion, or other arbitrary classification,'" Bordenkircher v.

*Hayes, supra,* 434 U.S., at 364, 98 S.Ct., at 668, quoting *Oyler v.
Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962),
including the exercise of protected statutory and constitutional
rights, see *United States v. Goodwin, supra,* 457 U.S., at 372, 102
S.Ct., at 2488.

Wayte, 470 U.S. at 608. Selective prosecution claims are governed by ordinary equal protection standards, which require Petitioner to show that the prosecution had a discriminatory effect and was motivated by a discriminatory purpose. Armstrong, 517 U.S. at 465; Wayte, 470 U.S. at 608. Petitioner "must demonstrate that (1) other similarly situated individuals have not been prosecuted and (2) his prosecution was based on an impermissible motive." United States v. Sutcliffe, 505 F.3d 944, 954 (9th Cir. 2007) (citing United States v. Culliton, 328 F.3d 1074, 1081 (9th Cir. 2003) (per curiam)). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" Armstrong, 517 U.S. at 465 (quoting United States v. Chemical Foundation, 272 U.S. 1, 14–15 (1926)).

On direct appeal, Petitioner argued that the trial court abused its discretion in denying his discovery motions regarding the prosecutor's charging habits, which he asserted would support "his defense was that he was being prosecuted as part of an orchestrated retaliation against him because he had '[sought] redress within the federal and state court systems concerning correctional officials illegal conduct violating stated rights under both entities Constitution.'" Smith, 2020 WL 2520062, at *13 (alteration in original). The California Court of Appeal held that the trial court properly denied the discovery motion based on Petitioner's "motion which contained no evidence that the district attorney's office had knowledge of the acts which appellant claims the prosecution to be retaliating against him for, as well as the prosecutor's declaration that he, nor the deputy district attorney who signed the initial case memorandum had any knowledge of such acts." Id. at *16. In finding that Petitioner "did not show an invidious purpose of prosecution," the court noted that Petitioner "did not produce any evidence that those who purportedly made 'false accusations' against him *knew* about any civil suits or complaints, much less that the prosecution 'singled him out' because of them" and that "the evidence [Petitioner] submitted undermined said claims." Id. at *16, 15.

1    In his habeas petition filed in the California Supreme Court, Petitioner did not address the

2    deficiencies set forth by the appellate court on direct appeal, and other than his uncorroborated

3    statements and declarations, Petitioner did not provide the California Supreme Court with

4    competent evidence to support his allegation that Petitioner was prosecuted in retaliation for

5    initiating civil rights lawsuits against law enforcement personnel. Thus, a fairminded jurist could

6    reasonably conclude that Petitioner's uncorroborated statements and declarations did not

7    constitute clear evidence to rebut the presumption that the prosecutor did not violate equal

8    protection. See Turner, 281 F.3d at 881 ("[S]elf-serving statements by a defendant that his

9    conviction was constitutionally infirm are insufficient to overcome the presumption of regularity

10   accorded state convictions." (internal quotation marks and citation omitted)).

11   Based on the foregoing, the Court finds that the state court's denial of the selective

12   prosecution claim was not contrary to, or an unreasonable application of, clearly established

13   federal law, nor was it based on an unreasonable determination of fact. The decision was not "so

14   lacking in justification that there was an error well understood and comprehended in existing law

15   beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly,

16   Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

17                                          **V.**

18                              **RECOMMENDATION**

19   Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of

20   habeas corpus be DENIED.

21   This Findings and Recommendation is submitted to the assigned United States District

22   Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

23   Rules of Practice for the United States District Court, Eastern District of California. Within

24   **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

25   written objections with the court and serve a copy on all parties. Such a document should be

26   captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

27   objections shall be served and filed within fourteen (14) days after service of the objections. The

28   assigned United States District Court Judge will then review the Magistrate Judge's ruling

1  pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within

2  the specified time may waive the right to appeal the District Court's order. Wilkerson v.

3  Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th

4  Cir. 1991)).

   IT IS SO ORDERED.

5

6     Dated:   **October 12, 2022**               /s/ Erica P. Grosjean

7                                            UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28